**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNIVERSAL BEAUTY PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 4840 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MAXIM BEAUTY PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The defendant has filed a motion for summary judgment on the plaintiff's Complaint, which alleges claims for trade dress infringement and unfair competition under 15 U.S.C. § 1125(a), and a claim under the Illinois Deceptive Trade Practices Act, 815 ILCS §§ 510/1 *et seq*. The Defendant's motion is based entirely on the argument that plaintiff did not suffer any damages due to defendant's admitted infringement of plaintiff's trade dress. For the following reasons, the defendant's motion [Dkt. # 118] is denied.

This case has had a surprisingly long history that has been discussed and alluded to on numerous occasions. Yet, it concerns nothing more than little blue bottles of hair glue with red caps. [Dkt. #1, Pars. 13, 20]. Or does it? Because, before we go any further, it's worthwhile to provide an example of the record that the parties have put together for this proceeding. It is because of that record, unfortunately, that this case's surprisingly long history is only going to get longer.

Here is what defendant's president had to say about bottle color at his Rule 30(b)(6) video deposition:

Plaintiff's Counsel: Does the bottle on left have blue on the left side of the bottle?

Defendant's President: What do you mean, the blue?

Q: Does it have blue on the left side?

A: I don't get it. What are you talking about, the blue?

Q: I'm talking about the Maxim glue on the left of the picture.

A: Okay.

Q: The blue is on the left, right, correct?

A: On the bottle, yes.

Q: And on the Salon Pros, the blue is on the left, correct?

A: You said the picture is blue, but actually the real one is not blue. It's two different

-- a little different colors. When you see -- do you see the real items?

Q: The what items?

A: Real one.

Q: Are you saying these picture don't represent what the --

A: The picture is the see -- yeah, yeah, I can say a little similar, but the real one is not similar like this.

Q: So are you saying these pictures are not accurate?

A Pictures are pictures.

Q: Is this picture not accurate?

A: You don't understand what I'm saying.

Q: I don't.

A: Where, the clothing, what kind of color I wear? You can tell me?

>Q: I don't know.
>
>A: This is the -- what color T-shirt I'm wearing?
>
>Q: I'm not going to answer your questions. . . . .

[Dkt. #120-1, Park Dep., at 47-49]. Most of the record the parties have compiled and submitted to the court reads a lot like this. It's not quite "Who's on First", but it's in the same ballpark.

In any event, those bottles (maybe they're indigo?) were plaintiff's trade dress, and defendant does not dispute that it copied them. Indeed, emails plaintiff has submitted show that defendant basically instructed the graphic designer to follow plaintiff's logo and design back in August of 2015. [Dkt. #129, Par. 5; #129-1, Page 27-34/234]. Plaintiff sent defendant a cease and desist letter in February 2017, and defendant said it would comply. [Dkt. #129, Pars. 6, 7; #129-1, Exs. 1, 2]. But, defendant made only slight changes [Dkt. #129, Par. 8] and plaintiff filed suit on June 28, 2017.

Discovery began way back in February 2018. Hope springing eternal and so when the parties felt they would need only six months to complete it, the court set a deadline of August 1, 2018. [Dkt. #22, Par. 3]. As of July 25, 2018, the parties agreed that "Defendant's total sales of the accused products [were] minimal, . . . ." [Dkt. #22, Par. 4]. Discovery was stayed at that point to allow for what turned out to be the foregoing futile settlement negotiations. The parties seemed to reach a settlement on September 13, 2018, but it was an oral agreement, with the terms not set forth on the record and with the parties specifically indicating they would "memorialize the material terms of their oral agreement in a subsequent written settlement agreement"; no obligations would arise until then. [Dkt. #28; #31 at 2; #47 at 3; #47-1, ¶ 5; #50, at 2-3]. The parties never made it to the written agreement stage and two subsequent motions to enforce the settlement agreement from the defendant [Dkt. #31, #46] were denied. [Dkt. #45, #67, #68].

3

The parties did not ramp discovery back up until January 2020 [Dkt. #82, Par. 1], and shortly thereafter, the challenges of the pandemic intervened in any progress the parties might have been making. [Dkt. # 72, 74, 76, 77, 81]. On August 3, 2020, the parties said they felt they still needed another seven months to complete fact discovery and asked for a fact discovery deadline of March 31, 2021. [Dkt. #82, Par. 1]. That was extended to April 30, 2021, on October 8, 2020. [Dkt. #88]. On March 16, 2020, fact discovery was extended seven additional months to December 1, 2021. [Dkt. #105]. Mercifully, as the fifth year of this case came toward a close, discovery *finally* ended and, on March 8, 2022, defendant filed its motion for summary judgment. Defendant's theory is that plaintiff cannot show damages because the evidence shows that defendant lost money as a result of manufacturing the infringing products. [Dkt. #119, at 3, 5-6, 8, 9]. As we shall see, the parties still have a ways to go.

## I.
## SUMMARY JUDGMENT

### A.
### Fed.R.Civ.P. 56

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must construe the evidence and all inferences that reasonably can be drawn from it in the light most favorable to the nonmoving party. *Allin v. City of Springfield*, 845 F.3d 858, 861 (7th Cir. 2017); *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 340 (7th Cir. 2016). But, the court makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). Not every purported factual dispute precludes summary judgment; the dispute must be material and genuine. *Alston v. City of Madison*, 853 F.3d 901, 910 (7th Cir. 2017).

A factual dispute is "genuine" only if a reasonable jury could find for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alston*, 853 F.3d at 910 (7th Cir. 2017). If the opponent "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]o survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of [his] case." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019).

**B.**

**Local Rule 56.1**

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a summary judgment proceeding." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 398 (7th Cir. 2012). Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ...party contends there is no genuine issue and that entitle the...party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir.2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir.2005).

The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph

in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir.2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

The district court is entitled to enforce strict compliance with its Local Rules regarding summary judgment motions. *Mendoza v. Herrera*, 2020 WL 3975468 (N.D.Ill. 2020). *See also Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015)("This court has repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment...."). Facts and responses that are not set out properly and appropriately supported in a Rule 56.1 filing will not be considered. *See Shaffer v. American Medical Association*, 662 F.3d 439, 442 (7th Cir.2011); *Bay Area Business Council*, 423 F.3d at 633. Moreover, when a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner the rule demands, those facts may be deemed admitted for purposes of the motion. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

## II.

## FACTS

After two years and five months of discovery, we should have significant insight into the world of the manufacture, sale, and distribution of hair glue in those little blue (or indigo) bottles of hair glue with red caps. But, as it turns out, we don't. It's not clear what has been going on in the nearly 30 months the parties have had to suss out their cases, but whatever was going on, it doesn't

seem like it was much discovery. From the parties' submissions, it seems the world of the manufacture, sale, and distribution of hair glue in those little blue (or indigo) bottles with red caps is a shadowy world. The seem to know precious little about their businesses – little about their sales, their losses, their profits.

The defendant submits just three pieces of evidence to support its motion for summary judgment: the deposition testimony of the defendant's president [Dkt. #120-1, the deposition testimony of the plaintiff's president [Dkt. #120-3], and a nine-page sales record covering about five months in 2017. [Dkt. #120-2]. The plaintiff counters with its cease and desist letter and defendant's response, the email between defendant and his graphic designer, an eighteen-page version of defendant's sales record, defendants' 2019 tax return, and defendant's deposition testimony. [Dkt. #129-1]. It's the deposition testimony that, in the main, both sides rely upon. But, as that deposition testimony – from both proprietors – paints it, the hair glue business is something of a mystery, even to its participants.

We'll start with the plaintiff. He doesn't know much about his company's sales or the effect that defendant's infringing activities had on his company:

> Q: So as a result of Maxim making a product that looked like yours, have you been damaged in any way?
>
> A: Like I explained, if the quality is wonderful, probably customer did not complain about it. If the quality is good, customer would not complain about quality. And one thing, if a customer complain about quality, always we investigate our product. And I remember I did not identify our product was defective or under quality. This is what I know about it.
>
> Q: Since 2017, have you lost any profits as a result of Maxim making products that look similar?

>A. I cannot say this answer. I cannot answer this answer because it is very lots of odd element can determine our profit and our sales volume. And if Maxim, yeah, they -- yeah, it might have an impact, of course. But if we ask some quantification, it's very hard to answer.

[Dkt. #120-3, at 26]. Plaintiff thinks their sales stayed the same from 2015 to 2016. Plaintiff had no idea whether there was an increase or decrease from 2016 to 2017 because he had no records. He thought there was "some difference" between 2017 ad 2018, but it was "small", "not . . . significant." [Dkt. #120-3, at 27-28]. Then he said sales were "about the same." [Dkt. #120-3, at 28].

That's not terribly satisfying after five years of litigation. But, plaintiff's president is a font of intricacies and minutiae when compared to the defendant's president, who seems to have barely a passing familiarity with his own business. To begin with, he isn't sure when he began it:

>Q: How long have you been the president?
>
>A: I don't know when I exactly I set up the company from the first day.
>
>Q: Okay. More than ten years?
>
>A: No.
>
>Q: More than 5 years?
>
>A: Maybe around.

[Dkt. #120-1, Park Dep., at 6-7]. He explained that the his company's hair glue wasn't very good [Dkt. #120-1, Park Dep., at 15, 31]; it hardened in the bottle after 3 to 5 months. [Dkt. #120-1, Park Dep., at 16-21].

The defendant's president is not terribly sure of his total sales numbers. It could be $200,000 a year [Dkt. #120-1, Park Dep., at 8, 31]; or, it could be $300,000 a year. [Dkt. #120-1, Park Dep.,

at 8]. More recently, he explained, sales have been very limited:

> Not because of the pandemic. But we -- I told you, we don't have much activity from '18 -- maybe '18 -- end of '19, 2018 or maybe '19, we don't have much activity, but a little bit. We just passing the merchandise.
>
>     \*   \*   \*
>
> I don't remember exactly, because I'm not very much, you know, involved in detail, because in detail, we don't have much business at all; just a few. You know, sometimes we bring some importer from, you know, some other company to pass my, you know, the –

[Dkt. #120-1, Park Dep., at 9]. How about sales of just the accused infringing product? The defendant's president's knowledge isn't any better:

> Q: So what's your estimate of how many units of this Maxim glue from Exhibit 2 that Maxim Beauty sold?
>
> A: Sold means we sold. Maybe not much. How many we made it, and then we put on the market at my warehouse, maybe around, you know, 99 Cents glue we called is maybe 100,000; maybe a little more or less. I don't know.
>
> Q: How many did you sell?
>
> A: How many we sold is a very tough to go because a few months we on the market; and, you know, the quality did change. We all -- most of them we threw away. So –
>
> Q: How many did you sell?
>
> A: I don't know. We threw away most of them; maybe 70 to 80 percent we throw away.
>
> Q How many did you make?
>
> A: That's on the book that I give to Universal.
>
> Q: 100,000?
>
> A: I don't know; maybe 100,000; maybe 150,000. I don't know. We give them all the information, we give to them; and that's only we have, because everything is destroyed.

9

[Dkt. #120-1, Park Dep., at 38].

When asked what his total profits on hair glue alone were since 2017, defendant's president said:

> In my memory, total sale, everything--30-Second, 99 Cents and even some other product, volume maybe two hundred less or more. I have no recollection for exact amount, but two hundred plus-minus.
> We have a lot of expenses because of the first time we start, a lot of inventory and a lot of wasting, you know, the testing materials.
> \*   \*   \*
> Maybe I can provide later about -- I believe I provided Universal the tax return I believe –
> \*   \*   \*
>
> -- that will maybe say everything. I don't know. Maybe; maybe not. And we give them all the saved report what we can save, just to figure out, like the $400,000, maybe -- $200,000 sale, maybe our income may be 20, 30 percent, 20 percent; and except, you know, some other product. Maybe glue itself, maybe ten, $20,000.

[Dkt. #120-1, Park Dep., at 115-116]. It's all but impossible to follow.

In a vain hope to get something a little more concrete, plaintiff's counsel asked

> Q: So if you -- correct me if I'm wrong, but you said you produced about 200,000 bottles of hair glue?
>
> A: No, not bottle; maybe volume is 200,000. So maybe a little different selling unit because eyelash glue is really expensive. The hair glue remover, the big size a little bit expensive; and all different prices. So I cannot figure out exactly what the amount. But I can say take it out ten, twenty thousand for -- we selling the profit, but actually we threw away so many items. So actually not the profit. We lost a lot of money.

[Dkt. #120-1, Park Dep., at 117]. Whether defendant "lost a lot of money", of course, is the key to defendant's summary judgment motion. But when asked about costs, defendant's president had no idea:

> Q: -- what did this cost Maxim Beauty to manufacture?

10

> A: I don't get it. I don't get it.
>
> Q: You said you sold this one for $1.99, but you had a cost that was below that presumably to make this glue and put it in the bottle.
>
> A: Uh-huh.
>
> Q: I want to know what that cost was. How much was your profit on this glue, and how much was the cost to make it?
>
> A: Do I have to tell you?

[Dkt. #120-1, Park Dep., at 35-36]. When plaintiff's counsel told him, yes, he did have to tell him, defendant's president suddenly didn't even know. That's a bit suspicious. If he actually didn't know, then why would he first have asked plaintiff's counsel if he had to answer? In any event, defendant's president then told plaintiff's counsel he would have to ask Mr. Li. [Dkt. #120-1, Park Dep., at 36]. Mr. Li was, apparently, "Like a manager, . . . [for] Maxim Beauty product." [Dkt. #120-1, Park Dep., at 9]. We don't have anything from Mr. Li in the record.

What we do have from the defendant is that nine-page record of sales from February 14, 2017, to July 26, 2017 [Dkt. #120-2]. July 2017, of course, is five months after defendant received the cease and desist letter and three months after it said it would comply. [Dkt. #129-1, Page 26-27/236]. Defendant says those sales amount to $33,500. [Dkt. #119, at 3; #120, Par. 7]. But, the sales record defendant submits in support of its motion is a mess, with the sales beginning on June 5, 2017, going to May 3, 2017, then May 24, 2017, the July 10, 2017, then back to April 24, 2017, then June 19, 2017, and so on, haphazardly through the nine pages. There are many unexplained redactions. The numbers that aren't redacted don't make sense at times. On at least eight occasions, defendant claims to have sold a 72-bottle box of hair glue for zero dollars. [Dkt. #120-2, at 1 (5/3/17), 4 (4/25/17; 5/25/17), 6 (5/3/17; 5/3/17), 7 (5/3/17)]; or ten 72-bottle boxes for zero dollars

11

[Dkt. #120-2, at 3 (5/20/17)], or even 160 boxes for zero dollars. The defendant offers no explanation for these figures and redactions other than to say they add up to $33,000 in sales. [Dkt. #119, at 3, 9; 120, Par. 7].

But, let's say that defendants' gross sales of the product in the offending little bottles was, indeed, $33,500. Again, the defendant's motion is based entirely on his claim that he lost money on the little blue (or indigo) bottles of hair glue. The defendant's two lynchpin asserted facts are that:

> 9. [Defendant] produced 100,000 of the allegedly infringing product and destroyed over 70,000 of them. (Exhibit "A" Park 38:10-40:22).
>
> 11. [Plaintiff] has no way to refute the fact that Maxim lost money and has no idea how much Maxim made off the Accused Packaging. (Exhibit "C" Universal 30(b)(6) at 30:12-14).

[Dkt. #120, Pars. 9. 11]. Based on the claimed terrible memory of the defendant's president, the only way defendant lost money would be if the cost per bottle were more than 33.5 cents. That would put the cost for 100,000 bottles at more than $33,500. But the defendant has absolutely no evidence to suggest what the costs were; just a naked claim of lost money. [Dkt. #130, at 7-8]. And that flaw is fatal to defendant's motion for summary judgment.

## II.

## ANALYSIS

Under the Lanham Act's damages provision, the district court may award a prevailing plaintiff "(1) [the] defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). But, significantly, the statute comes with a burden-shifting framework: "In assessing profits the plaintiff shall be required to prove defendant's sales only;

12

defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *see also 4SEMO.com Inc. v. S. Illinois Storm Shelters, Inc.*, 939 F.3d 905, 911 (7th Cir. 2019). Courts consistently find that when a trademark plaintiff offers evidence of infringing sales and the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales. *WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 609 (7th Cir. 2008); *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1095 (7th Cir. 1994)(" . . . the burden lay with [defendant] to produce such cost figures . . . ."). Defendant has produced no records – no evidence at all – of costs. That means – at least for the purposes of defendant's motion – that damages are equal to defendant's total sales of $33,500. *See, e.g., Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1163 (10th Cir. 2013)("Although evidence showed that [defendant] incurred unspecified costs associated with his purchases of StriVectin products, he failed to provide any records . . . Thus, the district court did not err when it set the profits award at $673,988.17—the total sales . . . ."); *Victorinox AG v. The B & F Sys., Inc.*, No. 13 CIV. 4534(JSR), 2015 WL 9256944, at *2 (S.D.N.Y. Dec. 15, 2015)("The price of defendants' gamesmanship is that there is now no evidence of costs that the Court may properly consider. Defendants have failed to carry their burden, or even to raise any triable question of fact, with respect to costs or deductions to be subtracted from the sales data. . . .Accordingly, the $583,830 sales figures must also be the measure of plaintiffs' damages."); *C & N Corp. v. Kane*, 953 F. Supp. 2d 903, 916 (E.D. Wis. 2013)("Defendants have provided no evidence of costs or deductions, and . . . admitted that [t]he[y] had never calculated the production cost of [the] product and was unable to ascertain the elements of those costs. Therefore, Defendants have failed to meet their burden to show which portions of its sales were not attributable to their infringing use or should otherwise be

13

deducted. Accordingly, [plaintiff] is entitled to an award amounting to Defendants' total revenue from its infringing sales . . . ."); *Fendi Adele S.r.l. v. Ashley Reed Trading, Inc.*, No. 06CIV0243RMBMHD, 2010 WL 11586410, at *15 (S.D.N.Y. Aug. 12, 2010)("Defendants have not introduced any evidence of their costs that can be attributed to the distribution and sales of the infringing . . . merchandise. Although defendants have proffered a conclusory assertion by [their] president—unsupported by documentary evidence—of the company's overall profit margin, they have made no effort to identify those costs that relate specifically to the infringing merchandise at issue. As such, a reasonable fact-finder could not rely on these assertions to deduct any costs from [defendant's] gross revenue from the sales of [infringing] merchandise."). Defendant's failure to provide any evidence whatsoever of costs – evidence that the statute *specifically* demands, 15 U.S.C. § 1117(a) – scuttles the defendant's claim that it lost money.

Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim. *Harnishfeger v. United States*, 943 F.3d 1105, 1116 (7th Cir. 2019); *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). If the movant has failed to make this initial showing, the court is obligated to deny the motion. *Hotel 71,* 778 F.3d at 601–02; *see also Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir.2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance."); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir.1994) (even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant

14

judgment in its favor). The defendant has not satisfied its initial burden in this case.

Simply put, the record defendant has provided does not show what defendant thinks it shows. It does not show plaintiff has no damages. All it shows is that defendant had $33,500 in sales. But evidence of sales is only the first step for a defendant; given evidence of sales, the burden is on the defendant to prove costs and/or deductions. And, like the defendant in *4SEMO.com*, the defendant here has not attempted to prove up any deductions. 939 F.3d at 911. Accordingly, the defendant's motion for summary judgment [Dkt. #118] has to be denied.[1]

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #118] is denied.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/2/22

---

[1] Defendant's motion for summary judgment on plaintiff's Deceptive Trade Practices claims must be denied as well. That portion of defendant's motion – rather vague and underdeveloped – seems to be based on plaintiff being unable to show damages and, as has been seen, that's not the case. To the extent it is not based on that, it appears to be based on the defendant ceasing production of hair glue which, the defendant argues, means plaintiff doesn't need an injunction. But, obviously, just because the defendant stopped doesn't necessarily mean he won't start up again. "[A]n infringer, once caught, must expect some fencing in . . . ." 5 McCarthy on Trademarks, supra, § 30:4, at 30–12; *Tamko Roofing Prod., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 40 (1st Cir. 2002). As for the case defendant cites, it deals with the fact that a *consumer* who brings a Deceptive Trade Practices claim cannot be entitled to an injunction because he has *already* suffered harm by purchasing the infringing product. The problem inherent in such consumer actions is the inability to allege facts which would indicate that the plaintiff is 'likely to be damaged.' Ordinarily, the harm has already occurred, thus precluding a suit for injunctive relief. *Brooks v. Midas-Int'l Corp.*, 47 Ill. App. 3d 266, 275, 361 N.E.2d 815, 822 (1977). Obviously, that doesn't apply to a manufacturer like the defendant.

15